# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 30, 2013

Lyle W. Cayce
Clerk

———————

Nos. 11-41385 &
11-41407

———————

UNITED STATES OF AMERICA,

Plaintiff–Appellee

v.

CRISTOBAL CERVANTES; LUIS EDUARDO ALVAREZ;
and MARK ANTHONY MILAN,

Defendants–Appellants

United States District Court
Southern District of Texas
FILED

FEB 2 6 2013    EGF

David J. Bradley, Clerk
Laredo Division

———————

Appeals from the United States District Court
for the Southern District of Texas
5:11-CR-425-1,2,&4

———————

Before JOLLY, PRADO, and HIGGINSON, Circuit Judges.

PRADO, Circuit Judge:

Appellants Mark Anthony Milan, Cristobal Cervantes, and Luis Eduardo Alvarez were convicted on charges stemming from a sting operation conducted by the Bureau of Alcohol, Tobacco, Firearms, and Explosives. Appellants, along with a fourth defendant who did not appeal, worked with an undercover agent to plan an armed home invasion with the aim of stealing a large quantity of drugs. The home invasion was a sham. Appellants were arrested on the day the invasion was set to happen and subsequently indicted on six counts. After a jury trial, Appellants were convicted on all six counts. They now appeal their

convictions and sentences on a number of grounds.[1]  As explained below, the district court's only error occurred when it applied a sentencing enhancement that should not have been applied.  Appellants' other arguments lack merit.  Therefore, we AFFIRM the convictions of Cervantes, Alvarez, and Milan; VACATE the sentences of Cervantes and Alvarez; and REMAND for resentencing.

## I.  **Factual Background**

In January 2011, an agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), received information that Mark Anthony Milan ("Milan") was interested in purchasing firearms.  During recorded conversations, Milan told the ATF agent that he was interested in getting as many weapons as the agent could supply.  In fact, Milan even attempted to negotiate a bulk discount.  The deal was eventually called off, however, when Milan was unable to procure the purchase money quickly enough.  Nevertheless, during the course of this attempted sting  operation, a second ATF agent saw a picture of Milan and immediately recognized him from an earlier investigation involving an attempted home invasion.  Based on the second agent's identification of Milan, taken together with other information received from a confidential source, the ATF elected to continue its investigation of Milan in hopes of eventually arresting him.

After the firearm sale fell through, an undercover ATF agent arranged a meeting with Milan through a confidential informant to discuss the armed

---

[1] In his brief, Milan briefly mentions a challenge to the evidentiary sufficiency of his convictions in his summary of argument section.  That specific contention does not appear anywhere else in his brief, however.  Having failed to present substantive argumentation on point, it is deemed waived. Fed. R. App. P. 28(a)(9).

invasion of a non-existent stash house. Through a series of meetings—recordings of which were presented at trial—Milan and Cervantes[2] were told about a drug stash house from which they could steal some twenty-five kilograms of cocaine. Specifically, the undercover agent claimed to have been cheated by his cartel employer, and he wanted Milan to steal cocaine from the cartel's stash house to settle the score. According to the ATF agent, the stash house would have at least twenty-five kilograms of cocaine within, and Milan's team could keep all cocaine recovered beyond the first five kilograms, which the ATF agent claimed he was owed.[3] At the time, twenty-five kilograms of cocaine in Laredo was worth over $400,000. The ATF agent also told Milan that the house would be guarded by at least two people, one of whom would be armed and intimidating. Milan and Cervantes agreed to rob the stash house, reassuring the ATF agent that "they had cars, they had guns." The ATF agent "was instructed at that time just to get them to the house, and they would do the rest." Milan and Cervantes repeatedly reassured the ATF agent that their crew would consist of professionals.

As planned, on March 9, 2011, the ATF agent informed Milan that the target shipment of drugs had arrived at the stash house. Milan and Cervantes met the agent at a pre-determined location, with two additional crew members in the car with them, and traveled together to a second location where the arrest

---

[2] While it appears that the ATF only intended to arrange a meeting with Milan, Cervantes and Milan arrived together at the first meeting on February 10, 2011.

[3] Importantly, the undercover agent repeatedly emphasized that cocaine was the only possible spoil of this particular invasion. That is, the agent made clear that the only item of value in the stash house would be cocaine. As the agent said during trial, "I wanted to be very clear that—I'm being very clear that there's no money in the house. It's not marijuana. It's not jewelry."

3

was scheduled to happen. After discussing the plan with Cervantes, the agent expressed a desire to review the plan with Milan and Cervantes' two associates, both of whom were still seated in Milan's vehicle. The agent's true desire was to identify the associates and ensure that they knew the nature of the group's plan. As the agent put it, he wanted to make sure that they "knew exactly why [they] were there." When Cervantes rolled down the window, the ATF agent was able to see Alvarez and Porras, both of whom he identified at trial.

The undercover agent then reviewed parts of the plan with all four individuals, but not before asking Alvarez and Porras if they understood English; both nodded in response. The agent reminded the group that the house would be guarded and that it contained at least twenty-five kilograms of cocaine. Cervantes showed the agent a pistol that Cervantes then tucked into his waistband and Porras held up a duffle bag containing two rifles. After he expressed nervousness regarding the risk entailed by the operation, Alvarez reassured the agent by telling him that the group did not consist of "rookies." Alvarez even went so far as to tell the undercover agent that he would go into the house first. At no point did Milan, Cervantes, Alvarez, or Porras express any doubt, uncertainty, or unwillingness to proceed.

Satisfied that the four men understood the plan, the undercover agent stepped away from the car and gave the arrest signal. The four men were then arrested without incident. The defendants were dressed in all black, and within the automobile the police recovered black hats bearing police labeling. Further, Alvarez and Porras were wearing bulletproof vests. At trial, Appellants were convicted on all six counts charged, whereas Porras, the fourth defendant, was convicted of only a single count.

## II.    Jurisdiction

The district court had jurisdiction under 18 U.S.C. § 3231. After judgment was entered, Appellants filed timely notices of appeal. As such, this Court has jurisdiction under 28 U.S.C. § 1291.

## III.    Discussion

Appellants present a number of issues on appeal, some that are Appellant-specific and others that overlap. Distinct legal issues are dealt with individually, but where Appellants have raised identical challenges, those issues are dealt with collectively under a single heading.

### A.    Whether the Magistrate Judge erred in limiting the number of Appellants' relatives present for voir dire.

Criminal defendants are guaranteed a public trial by the Sixth Amendment. *United States v. Osborne*, 68 F.3d 94, 98 (5th Cir. 1995). The right to a public trial helps ensure, *inter alia*, the fairness of the proceedings. *Id.* (citing *Waller v. Georgia*, 467 U.S. 39, 46 (1984)). However, the right is not absolute. *Id.* (citing *Waller*, 467 U.S. at 45). Whereas the Supreme Court has enumerated a four-part test for determining whether closed proceedings are warranted, the requisite analysis varies when, as here, the challenged closure was partial rather than complete. *Id.* (citing *Aaron v. Capps*, 507 F.2d 685, 688 (5th Cir. 1975)).

When a criminal proceeding is only partially closed, the court must "look to the particular circumstances of the case to see if the defendant will still receive the safeguards of the public trial guarantee." *Osborne*, 68 F.3d at 98. This is because "the partial closing of court proceedings does not raise the same

constitutional concerns as a total closure because an audience remains to ensure the fairness of the proceedings." *Id.* Partial closure of a courtroom during a criminal proceeding is a constitutional question reviewed de novo, and the Court will affirm so long as the lower court had a "substantial reason" for partially closing a proceeding. *Id.* at 98–99.

Both Alvarez and Cervantes claim that the magistrate judge committed reversible error when he partially closed voir dire.[4] Before jury selection began, the magistrate judge determined that each defendant could have only three relatives present in the courtroom during voir dire. The magistrate judge so decided in response to a request from Cervantes to allow six of his family members to observe the proceeding. The decision was made in light of a number of considerations, including the limited space available within the courtroom, the nature of the proceedings, and the desire to minimize disruptions. The judge was also concerned about Cervantes's close proximity to panel members without shackles given an earlier violent outburst at his detention facility. Alvarez and Cervantes claim that the partial closure of voir dire violated their Sixth Amendment right to a public trial.[5] As discussed below, the magistrate judge

---

[4] Additionally, Cervantes cursorily claims his Sixth Amendment right to a public trial was violated when two of his relatives were removed from the courtroom during trial after their child fell asleep multiple times. This argument completely lacks merit, however, since Cervantes offers no meaningful argumentation on point and only superficially cites *Presley v. Georgia*, 558 U.S. 209 (2010), an inapposite case concerning the complete closure of proceedings from the public.

[5] Alvarez arguably waived his objection to the partial closure of voir dire for two reasons. First, Alvarez did not request to have more than three family members present at voir dire such that the magistrate judge's determination completely satisfied Alvarez's request. Second, Alvarez did not object when voir dire was partially closed.

gave multiple substantial reasons for partially closing voir dire, and we will affirm.

In *Osborne*, a case involving sexual assault against a minor, the district court excluded an observer from the courtroom during the victim's testimony because the observer was both the sister of the defendant and the aunt of the victim. 68 F.3d at 99. Partial closure during the victim's testimony was intended to facilitate her testimony by removing from the courtroom an individual whose "presence may have traumatized the witness," even though other relatives of the defendant were allowed to stay. *Id.* This Court upheld the district court's partial closure because substantial reasons were present—protecting the victim and facilitating her testimony—and because the balance of individuals remaining in the courtroom protected the defendant's interest in a fair trial subject to observation by the public. *Id.* The district court was admonished, however, for failing to develop a detailed record of the issues and findings on point. *Id.*

Here, the magistrate judge presented multiple substantial reasons for partially closing voir dire and detailed those reasons on the record. As explained to the parties, the magistrate judge was concerned about available space within the courtroom, even though the courtroom was technically capable of fitting extra observers. And while other larger courtrooms were available, the proceedings had already encountered numerous delays, and the magistrate judge wished to avoid further delay. The court also had serious concerns about the panel members' comfort and safety given the nature of the case. Since this case involved narcotics and firearms in a border town where violent, drug-related disputes are common, the judge was concerned that the close proximity of the

7

defendants' families might chill jurors' responses during voir dire. Further, if jurors did not feel comfortable enough to fully and honestly answer the court's questions, then the court would be unable to empanel an impartial jury. *Cf. United States v. Edwards*, 303 F.3d 606, 617 (5th Cir. 2002) (protecting the defendants' right to a fair trial constitutes a substantial interest for Sixth Amendment purposes).

In addition to stating multiple reasons for excluding some of Cervantes's family from voir dire, the magistrate judge allowed the defendants to each have three family members present. This allowance, combined with the general public's access to voir dire, protected Appellants' interest in a public trial, thereby satisfying the Sixth Amendment. *See Osborne*, 68 F.3d at 98. Given the circumstances of this case, the magistrate judge presented more than one substantial reason justifying a partial closure of voir dire; and the partial closure did not jeopardize the defendants' right to a fair, public trial. *Id.* Therefore, we affirm the magistrate judge's decision to partially close voir dire.

### B. Whether the Magistrate Judge abused his discretion when he declined to question potential jurors regarding entrapment.

Refusal to ask a specific question during jury selection is reviewed for abuse of discretion. *United States v. Harper*, 527 F.3d 396, 409 (5th Cir. 2008). "The trial court has broad discretion to determine who will question potential jurors and what questions will be asked." *United States v. Rasco*, 123 F.3d 222, 231 (5th Cir. 1997). Accordingly, unless abuse of discretion and prejudice are shown, this Court will not disturb "the scope and content of voir dire . . . on appeal." *United States v. Okoronkwo*, 46 F.3d 426, 433 (5th Cir. 1995). In the Fifth Circuit, "it is not an abuse of discretion to refuse to allow inquiries of jurors

as to whether they can accept certain propositions of law." *United States v. Ledee*, 549 F.2d 990, 992 (5th Cir. 1977); *accord United States v. Rodriguez*, 993 F.2d 1170, 1176 (5th Cir. 1993). Rather, an abuse of discretion is present when "there is insufficient questioning to produce some basis for defense counsel to exercise a reasonably knowledgeable right of challenge." *Rodriguez*, 993 F.2d at 1176. As explained below, the magistrate judge did not abuse his discretion.

On appeal, Cervantes challenges the magistrate judge's refusal to question potential jurors about the law of entrapment, a defense which Cervantes intended to rely on at trial. Cervantes requested that the magistrate judge read a proposed entrapment instruction and ask jurors whether they could follow that law, a request that the magistrate judge declined. Denial of the request notwithstanding, the magistrate judge told the potential jurors that they would be obligated to evaluate the evidence impartially, follow the law, and obey the trial judge's instructions. The magistrate judge also inquired into other topics that would indicate potential prejudice, including relationships with law enforcement officers, prior jury service, experience with the criminal justice system, and possible connections to any of the individuals involved in the defendants' case. Cervantes now claims that the failure to question potential jurors regarding their knowledge of and willingness to apply the law of entrapment prevented him from properly evaluating potential jurors. However, Cervantes has failed to show an abuse of discretion.

In his brief, Cervantes claims that the entrapment inquiry was reasonably necessary for him to exercise his peremptory challenges. However, he fails to demonstrate what a specific entrapment inquiry would have yielded beyond the answers elicited when the magistrate judge asked the jury panel whether they

would be able and willing to follow the law as laid out by the trial judge. Such an inquiry occurred at multiple points during voir dire and addressed Cervantes's concerns in general terms. Questioning jurors specifically about the law of entrapment would not have significantly contributed to Cervantes's ability to exercise his peremptory challenges or the voir dire generally. Rather, the magistrate judge meaningfully inquired into potential jurors' ability and willingness to follow the legal principles set forth at trial, and the decision to exclude questions specifically pertaining to entrapment was well within the discretion of the court. The magistrate judge was not required to inquire regarding entrapment at counsel's behest, and it was within the magistrate judge's discretion to refuse counsel's request. The substantively similar, if more general, questions asked by the magistrate judge covered much of what Cervantes sought and enabled Cervantes "to exercise a reasonably knowledgeable right of challenge." *Rodriguez*, 993 F.2d at 1176. The magistrate judge therefore did not abuse his discretion, and we affirm.

## C. Whether Milan or Cervantes suffered prejudice when Alvarez's attorney asked an improper question.

It is a well established rule that a defendant's decision not to testify at trial may not be commented on during the course of the trial. *Doyle v. Ohio*, 426 U.S. 610, 617–18 (1976); *United States v. Davis*, 609 F.3d 663, 685 (5th Cir. 2010). However, not all comments touching on a defendant's decision to remain silent run afoul of the Fifth Amendment. A comment violates the Fifth Amendment if the language used "was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *United States v. Rocha*, 916 F.2d 219,

232 (5th Cir. 1990) (quoting *Davis v. United States*, 357 F.2d 438, 441 (5th Cir. 1966)). The comment must have a clear effect on the jury to warrant reversal, and the doctrine of harmless error applies: an otherwise impermissible comment will not require reversal if it did not contribute to the jury's verdict beyond a reasonable doubt. *United States v. Moreno*, 185 F.3d 465, 475 (5th Cir. 1999).

Here, Milan and Cervantes object to a single question posed by Alvarez's attorney while cross-examining their co-defendant, Porras. At the outset of questioning, counsel asked Porras whether he was the third of four defendants, which Porras answered affirmatively. He then asked, "And the first two have already been asked if they wanted to take the stand and they have declined?" Counsel for Milan and Cervantes immediately objected, and the trial judge moved quickly to admonish Alvarez's attorney, going so far as to suggest that his question "borders on sanctionable conduct." After chiding counsel, the trial court quickly mitigated the situation by reminding the jury to completely disregard the question and to not allow it a role in deliberations. And, at the close of trial, none of the defendants requested a jury instruction on the Fifth Amendment.

The question posed by Alvarez's attorney did not contribute to the jury's verdict. Before the trial even began, the magistrate judge spoke at length regarding the defendants' right to remain silent and the fact that jurors may not hold the exercise of that right against the defendants during deliberations. Moreover, as soon as Alvarez's attorney made an indirect reference to Milan and Cervantes's decision not to testify, the trial court quickly admonished counsel and instructed the jury to disregard the question entirely. These instructions alone provided ample protection against any prejudicial impact counsel's lone question may have had on the jury's deliberation. Furthermore, it is important

to note that none of the parties requested jury instructions on the right to remain silent, either at the time of counsel's question or at the end of the trial. While it is not even clear that counsel's question "was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify," *Rocha*, 916 F.2d at 232, the question posed did not influence the jury's deliberations, *Moreno*, 185 F.3d at 475. The trial court repeatedly reminded the jury that defendants had the right to remain silent and acted swiftly when counsel asked the question at issue. Therefore, we affirm.

### D. Whether the district court erred in admitting evidence of a prior attempted home invasion.

Evidence of prior bad acts may not be used to prove a person's character or conduct in accordance with their character. Fed. R. Evid. 404(b)(1); *United States v. Beechum*, 582 F.2d 898, 910 (5th Cir. 1978) (en banc). However, under Rule 404(b)(2), evidence of other acts is admissible to prove, *inter alia*, "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). This Circuit has further held that evidence of prior acts intended to rebut an entrapment defense falls within the ambit of Rule 404(b). *United States v. Hooker*, 997 F.2d 67, 76 (5th Cir. 1993). But any such evidence must still pass muster under Rule 403: its probative value may not be substantially outweighed by any unfair prejudice against the defendant. *See Beechum*, 582 F.2d at 911 ("What the rule calls for is essentially a two-step test. First, it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character. Second, the

evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of [R]ule 403.").

At trial, the government introduced into evidence footage from a security camera showing an attempted armed home invasion committed by Milan and others in December 2007. Additionally, the government produced testimony from two individuals who were in that home during the attempted invasion, as well as the officer who arrested Milan at the scene of the crime. The government sought to introduce this evidence in order to rebut Milan's claim of entrapment by showing his predisposition, and objections were raised. While the trial court acknowledged that the evidence had the potential to produce some undue prejudice against the co-defendants, the court nevertheless deemed it highly relevant. Moreover, to mitigate possible prejudice against the defendants, the court agreed to give a limiting instruction stating that the evidence was limited to Milan's predisposition. Indeed, the district court made both points clear before allowing the government to proceed and again at the close of trial. Appellants claim that the district court erred in admitting this evidence. They argue that the evidence was unduly prejudicial and that it suggested guilt by association to the jury since Appellants were members of the same gang as Milan.

If a defendant preserves his challenge to the introduction of Rule 404(b) evidence, the district court's decision is reviewed for abuse of discretion, subject to harmless error analysis. *United States v. Girod*, 646 F.3d 304, 318 (5th Cir. 2011). "If the defendant does not object, then plain error review applies." *United States v. Morin*, 627 F.3d 985, 994 (5th Cir. 2010). Plain error is present if a defendant can show that (1) there was error; (2) it was plain; and (3) it affected

his substantial rights. *Id.* An error generally only affects a defendant's substantial rights if it was prejudicial; that is, if there is a reasonable probability that the proceedings would have produced a different result but for the error. *Id.* Having reviewed the record and Appellants' briefs, only Milan and Cervantes objected to this evidence at trial. Indeed, Alvarez concedes that he did not object. As such, Alvarez's objection will be reviewed for plain error, *Morin*, 627 F.3d at 994; the objections of Milan and Cervantes will be reviewed for abuse of discretion, *Girod*, 646 F.3d at 318.

The arguments put forth by Milan and Cervantes are unpersuasive and do not show an abuse of discretion. First, contrary to their claims, the prior act evidence admitted here certainly had probative value as to Milan's predisposition. Milan was charged with involvement in a conspiracy to commit an armed home invasion. Based on the evidence adduced at trial, the four defendants were prepared to attack a house using firearms and black clothing bearing police insignia. The prior home invasion attempt showed many similarities to the charged act: a group of well-armed men attempted to launch a swift, organized assault on a residential property. Since Milan claimed entrapment, it became the government's burden to show predisposition; and "demonstrated experience in the criminal endeavor" qualifies as evidence of predisposition. *United States v. Theagene*, 565 F.3d 911, 919 (5th Cir. 2009). This evidence showed experience in armed home invasions and was thus highly relevant to Milan's predisposition.

Second, the probative value of this evidence was not substantially outweighed by undue prejudice. The evidence presented was not inflammatory or heinous; the government did not seek to admit graphic, explicit, or otherwise

evocative evidence. *Cf. Beechum*, 582 F.2d at 917 (affirming predisposition evidence that was not "of a heinous nature" or likely to "incite the jury to irrational decision by its force on human emotion"). The government presented a surveillance video showing an armed individual trying to gain access through the front door of a house and testimony from people within the house at the time of the incident, as well as from the arresting officer. Nothing presented was of a sort that would incite the jury to an irrational decision. Furthermore, the district court gave specific limiting instructions both when the evidence was admitted and at the close of trial. Accordingly, it was not an abuse of discretion to admit evidence of Milan's prior attempted home invasion.

Alvarez's argument also fails because the district court committed no error. Under Rule 404(b), the evidence of Milan's prior attempted home invasion was clearly relevant to his predisposition since it demonstrated Milan's experience with this sort of criminal endeavor. Moreover, the evidence itself was not heinous, provocative, or otherwise prejudicial. The evidence did not pertain to Alvarez's predisposition, and the district court was mindful to give specific, detailed limiting instructions to the jury to that effect. The court instructed the jury that the evidence bore on the predisposition of a single defendant when the evidence was introduced and again at the close of trial. The trial court's instructions mitigated the possibility that the evidence would produce guilt by association, as Alvarez fears. Therefore, we affirm.

### E. Whether there was sufficient evidence to support two of Alvarez's convictions.

This Court reviews motions for acquittal de novo. *United States v. Clayton*, 506 F.3d 405, 412 (5th Cir. 2007) (per curiam). "In reviewing the

sufficiency of the evidence, we view the evidence and the inferences drawn therefrom in the light most favorable to the verdict, and we determine whether a rational jury could have found the defendant guilty beyond a reasonable doubt." *Id.* The evidence itself need not refute every defense hypothesis; "the jury is free to choose among reasonable constructions of the evidence." *Id.* (quoting *United States v. Anderson*, 174 F.3d 515, 522 (5th Cir. 1999)).

Alvarez contends here that there was insufficient evidence to convict him of conspiracy to possess a controlled substance with intent to distribute and aiding and abetting the possession of a firearm in furtherance of a drug trafficking crime. He argues that there was no evidence that he knew about the drugs involved in the armed home invasion, and he claims that the government did not prove that he shared his co-conspirators' criminal intent for the aiding and abetting charge since the undercover agent initially only met with Milan and Cervantes to plan the home invasion. As explained below, these arguments are unpersuasive. The government presented sufficient evidence, viewed in the light most favorable to the verdict, showing that Alvarez conspired to possess a controlled substance with intent to distribute and that he aided and abetted the possession of a firearm in furtherance of a drug trafficking crime.

The elements of Alvarez's drug conspiracy charge are (1) an agreement with another person; (2) knowledge of the agreement; and (3) voluntary participation in the conspiracy. *United States v. Percel*, 553 F.3d 903, 910 (5th Cir. 2008). "Absent direct evidence of an agreement, the jury can infer the existence of an agreement from circumstantial evidence." *Id.* Viewed in the light most favorable to the verdict, the government presented sufficient evidence to justify Alvarez's conspiracy conviction. The government presented

uncontradicted testimony identifying Alvarez at the site of the arrest and as the individual, prior to arrest, who stated that he was "going in first" and that the armed men were "not rookies." These statements were recorded and presented at trial. Further, after verifying that Alvarez spoke English, the agent explained the nature of the invasion in detail to the four defendants. Specifically, the agent reiterated that the house would be guarded by at least two individuals, one of whom had a firearm, and that there would be at least twenty-five kilograms of cocaine for the men to steal. The circumstances surrounding the arrest show that the four defendants were clearly engaged in a joint criminal enterprise, and the jury was entitled to credit the evidence and testimony presented. The jury thus had more than sufficient evidence to conclude that the elements of a drug conspiracy were met.

To be convicted of aiding and abetting possession of a firearm in furtherance of a drug trafficking crime, the government must show (1) that the offense occurred and (2) that Alvarez associated with the venture, participated in it as something he wished to bring about, and sought to make it succeed. *Percel*, 553 F.3d at 911. Alvarez must also have shared the group's criminal intent. *Id.* In his brief, Alvarez contends that there was insufficient proof that he shared his partners' criminal intent or that he knew the crime involved drugs. Here again, the government presented sufficient evidence, viewed in the light most favorable to the verdict, to convict Alvarez.

As explained above, Alvarez clearly knew that the group's plan involved drugs. The undercover agent asked Alvarez if he spoke English and then reiterated that they were to rob a drug stash house containing at least twenty-five kilograms of cocaine. Alvarez contends that he was present for an

insufficient amount of time for a proper criminal scheme to form, but the test does not include a temporal element. At no time did Alvarez express disagreement with the plan or attempt to disassociate himself. Likewise, Alvarez shared his partners' criminal intent. Alvarez told the undercover agent that he would go in first and specifically reiterated that the group did not consist of rookies. He knew that the group was armed, he was prepared to participate, and he wanted the invasion to succeed. Given this evidence, a rational jury could certainly have found Alvarez guilty beyond a reasonable doubt. Therefore, we affirm.

### F.    Whether there was sufficient evidence of predisposition.

"When a jury, which was fully charged on entrapment, rejects the defendant's entrapment defense, the applicable standard of review is the same as that which applies to sufficiency of the evidence." *United States v. Rodriguez*, 43 F.3d 117, 126 (5th Cir. 1995). As with the arguments discussed immediately above, this Court reviews the sufficiency of the evidence regarding predisposition de novo. *United States v. Clayton*, 506 F.3d 405, 412 (5th Cir. 2007).

The entrapment defense operates using a burden-shifting regime. *United States v. Theagene*, 565 F.3d 911, 918 (5th Cir. 2009). If a defendant makes a prima facie showing of entrapment,[6] then the government must prove beyond a reasonable doubt that the defendant was already predisposed to commit the alleged offense when the government approached him. *Id.* There is no formulaic way to prove predisposition. *See United States v. Chavez*, 119 F.3d 342, 346 (5th

---

[6] "This requires the defendant to make a prima facie showing of (1) his lack of predisposition to commit the offense and (2) some governmental involvement and inducement more substantial than simply providing an opportunity or facilities to commit the offense." *Theagene*, 565 F.3d at 918.

Cir. 1997) (per curiam) ("Many factors may indicate a defendant's predisposition . . . ."). In fact, "a defendant's ready and willing participation in government-solicited criminal activity, standing alone, is sufficient to prove predisposition." *United States v. Reyes*, 239 F.3d 722, 739 (5th Cir. 2001). Other possible factors include "desire for profit; demonstrated knowledge or experience with the criminal activity under investigation; the character of the defendant, including past criminal history; whether the government first suggested criminal activity; and the nature of the inducement offered by the government." *Id.*

Here, the government presented sufficient evidence, viewed in a light most favorable to the verdict, to support the jury's rejection of Appellants' entrapment defenses.[7] Cervantes demonstrated his eagerness to participate in the ATF's proposed home invasion on a number of occasions. He met with the undercover agent three separate times and, on the day of his arrest, showed the agent the pistol he intended to use as he tucked it in his waistband. Likewise, Alvarez volunteered to the agent that he would "go in first," a clear indication of eagerness. The two men also clearly had a profit motive since the cocaine they were going to steal was worth nearly half a million dollars. On no occasion did either Cervantes or Alvarez express hesitation or doubt concerning the group's plan. There was thus sufficient evidence to demonstrate that Cervantes and Alvarez were predisposed to commit this crime. Therefore, we affirm.

## G.     Whether cumulative error occurred.

The cumulative error doctrine provides for reversal when an aggregation of non-reversible errors, *i.e.*, plain and harmless errors that do not individually

---

[7] Milan does not present any entrapment issues on appeal. Only Cervantes and Alvarez have challenged the sufficiency of the government's predisposition evidence.

warrant reversal, cumulatively deny a defendant's constitutional right to a fair trial. *United States v. Delgado*, 672 F.3d 320, 343–44 (5th Cir. 2012) (en banc). However, the cumulative error doctrine is only to be used in "rare instances." *Id.* at 344. Reversal is justified "only when errors 'so fatally infect the trial that they violated the trial's fundamental fairness.'" *Id.* at 344 (quoting *United States v. Fields*, 483 F.3d 313, 362 (5th Cir. 2007)). As an illustration of how high the cumulative error standard is, this Circuit reversed a conviction on cumulative error grounds in *United States v. Riddle*, 103 F.3d 423 (5th Cir. 1997), when the trial court "improperly admitted two and a half days of expert prosecution testimony, erroneously prevented the defense expert from testifying, admitted six documents containing hearsay, and allowed testimony about other crimes for which the defendant was not on trial." *Delgado*, 672 F.3d at 344 n.31. Allegations of non-errors do not play a role in cumulative error analysis since there is nothing to accumulate. *Id.* at 344.

In support of his cumulative error claim, Cervantes cites the admission of prior act evidence in violation of Rules 403 and 404(b), the failure to question potential jurors on the law of entrapment, the exclusion of some family members from voir dire, and a comment made by Alvarez's attorney regarding the co-defendants' exercise of their Fifth Amendment rights. Of the errors cited, only the last allegation potentially constitutes an error. As this opinion has discussed, Cervantes's other claims did not amount to error and thus have no impact on cumulative error analysis. Even assuming the single question posed by Alvarez's attorney was improper, it is clearly insufficient to justify reversal for cumulative error as it did not deny Cervantes a fair trial. Therefore, we affirm.

Alvarez also argues that a cumulation of errors prevented him from receiving a fair trial. However, his cumulative error argument is identical to his ineffective assistance of counsel claim. That is, Alvarez's cumulative error argument is based exclusively on the same considerations used to claim ineffective assistance of counsel. As explained below, Alvarez's ineffective assistance of counsel claim is not yet ripe for review because the issue was not raised in the district court. *See* Part III.J, *infra.* Since Alvarez's ineffective assistance of counsel claim is not ripe for review, the Court cannot determine whether there are in fact errors to accumulate for purposes of cumulative error review.

### H. Whether applying a sentencing enhancement for firearm possession was erroneous.

If an objection is not preserved below, this Court applies plain error review. *Morin*, 627 F.3d at 994. Plain error is present if a defendant can show that (1) there was error; (2) it was plain; and (3) it affected his substantial rights. *Id.* An error generally only affects a defendant's substantial rights if it was prejudicial; that is, if there is a reasonable probability that the proceedings would have produced a different result but for the error. *Id.* Neither Cervantes nor Alvarez objected to the application of a firearm enhancement at sentencing.[8]

Cervantes and Alvarez were convicted of, among other charges, conspiracy to possess a controlled substance with intent to distribute under 21 U.S.C. § 846 and possessing a firearm in furtherance of a drug trafficking crime under 18

---

[8] Milan has not challenged his sentence, likely because the firearm enhancement error discussed here would have been harmless as to him. In Milan's case, removing the two-level enhancement would not affect the applicable mandatory minimum because his prior drug conviction raised the applicable mandatory minimum sentence anyway.

U.S.C. § 924(c)(1)(A)(I). Because the drug conspiracy charge involved firearms, the Pre-Sentencing Reports for both defendants recommended a two-level enhancement pursuant to § 2D1.1(b)(1) of the Sentencing Guidelines. U.S. Sentencing Guidelines Manual § 2D1.1(b)(1) (2011) ("If a dangerous weapon (including a firearm) was possessed, increase by 2 levels."). However, Appellants contend—and the government concedes—that this enhancement constitutes inappropriate double punishment since Alvarez and Cervantes were also separately sentenced for possession of a firearm in furtherance of a drug trafficking crime. This Court has held that the enhancement contained in § 2D1.1(b)(1) impermissibly punishes a defendant twice for the same conduct if it is levied in conjunction with a sentence for violating 18 U.S.C. § 924(c). *United States v. Benbrook*, 119 F.3d 338, 339 (5th Cir. 1997). This comports with the approach advocated by the Sentencing Guidelines:

> Do not apply any weapon enhancement in the guideline for the underlying offense, for example, if (A) a co-defendant, as part of the jointly undertaken criminal activity, possessed a firearm different from the one for which the defendant was convicted under 18 U.S.C. § 924(c); or (B) in an ongoing drug trafficking offense, the defendant possessed a firearm other than the one for which the defendant was convicted under 18 U.S.C. § 924(c).

U.S. Sentencing Guidelines Manual § 2K2.4 cmt. n.4. Therefore, the district court clearly erred in applying a two-level enhancement to the drug conspiracy charge. We therefore vacate Cervantes and Alvarez's sentences and remand for re-sentencing.

## I. Whether applying a sentencing enhancement for body armor possession was erroneous.

If an objection is not preserved below, this Court applies plain error review. *Morin*, 627 F.3d at 994. Plain error is present if a defendant can show that (1) there was error; (2) it was plain; and (3) it affected his substantial rights. *Id.* An error generally only affects a defendant's substantial rights if it was prejudicial; that is, if there is a reasonable probability that the proceedings would have produced a different result but for the error. *Id.* At sentencing, the government need only prove by a preponderance of the evidence those facts necessary to calculate a sentence. *United States v. Ollison*, 555 F.3d 152, 164 (5th Cir. 2009). "[T]he district court is entitled to rely upon the information in the [Presentence Report ("PSR")] as long as the information bears some indicia of reliability. The defendant bears the burden of presenting rebuttal evidence to demonstrate that the information in the PSR is inaccurate or materially untrue." *United States v. Scher*, 601 F.3d 408, 413 (5th Cir. 2010) (citations omitted); *see also United States v. Sampson*, No. 02-20195, 2002 WL 31689255, at *1 (5th Cir. Oct. 30, 2002) (unpublished) ("In the absence of any evidence that the information in the PSR was materially untrue, the district court did not err in finding the PSR reliable and adopting the factual findings therein for sentencing purposes.").

Alvarez received a four-level enhancement at sentencing for the use of a bulletproof vest in preparation for the armed home invasion the defendants had planned. *See* U.S. Sentencing Guidelines Manual § 3B1.5. At trial, the government presented testimony concerning the body armor some of the defendants were wearing, and introduced pictures of Alvarez wearing a bulletproof vest upon arrest and pictures of the vest itself. At no point during trial or sentencing did Alvarez contest that he was in fact wearing body armor

as defined in § 3B1.5. Only now, on appeal, does Alvarez challenge the government's failure to prove that his bulletproof vest qualified as such.

Despite his protestation, Alvarez has given no reason to suggest that the PSR, which stated that Alvarez was wearing bulletproof body armor, was inaccurate or materially untrue. The PSR comports with the evidence presented at trial, which suggested Alvarez was wearing a commercially-available vest stolen from a police vehicle; and there appears to be no error. Accordingly, Alvarez's PSR bears the requisite indicia of reliability and the district court was entitled to rely on it. Because Alvarez failed to identify evidence or present argument suggesting that the PSR was materially untrue, we affirm.

**J.    Whether Alvarez received ineffective assistance of counsel.**

The general rule in the Fifth Circuit is that Sixth Amendment ineffective assistance of counsel claims are not reviewed on direct appeal unless they were "adequately raised in the trial court." *United States v. Stevens*, 487 F.3d 232, 245 (5th Cir. 2007). In order to provide competent review of such claims, the appellant must develop the record at the trial court. *Id.*; *United States v. Pierce*, 959 F.2d 1297, 1301 (5th Cir. 1992). Only in those "rare cases" where the record is sufficiently developed will this Court review Sixth Amendment ineffective assistance of counsel claims on direct appeal. *United States v. Palmer*, 122 F.3d 215, 221 (5th Cir. 1997).

Here, Alvarez claims a litany of shortcomings that allegedly amount to ineffective assistance of counsel. However, this direct appeal is the first time that Alvarez has claimed ineffective assistance of counsel. Having not raised this issue below, the record is insufficiently developed to enable review of Alvarez's claim. *Stevens*, 487 F.3d at 245. Accordingly, we deny Alvarez's

ineffective assistance of counsel claim without prejudice to his right to pursue the claim in collateral review.

## IV. <u>Conclusion</u>

For the foregoing reasons, the sentences of Alvarez and Cervantes are VACATED and REMANDED for resentencing. We AFFIRM Appellants' convictions and sentences on all other grounds, and DENY WITHOUT PREJUDICE Alvarez's ineffective assistance of counsel claim.