United States District Court
Southern District of TEXAS

United States District Court
Southern District of Texas
FILED

MAR 3 1 2015

David J. Bradley, Clerk
Laredo Division

DMG

Supplemental Memorandum of Law in support of Ground one submitted on behalf of Cristobal Cervantes Due to counsel's innefective assistance as to Raise the outrageous government conduct before trial.

## I. Introduction

"Lead us not into temptation" Judge Noonan warned United States v. Black, 733 F.3d 294, 313 (NOONAN:J. dissenting). But into temptation the Government has gone, ensnaring chronically unemployed individuals from Poverty-ridden areas in its fake drug stash-house robberies. While undoubtedly Reverse sting, a law enforcement tool when employed to target or Ricuit demonstrated criminal enterprises, reverse stings offend the United States Constitution when used solely to obtain convictions.

Though the court is mindful that fighting Crime is undoubtedly an arduous task that the Executive Branch must endure. But as James Madison wrote in the Federalist NO. 51, If angels were to govern men, neither external nor internal control on government would be necessary. In framing a government which is to be administered by men over men, the great difficulty lies in this: You must first enable the government to control the governed; and in the next place oblige it to control itself.

The only way to effectively control Government in this case and effectuate the due Process that the constitution demands is to vacate sentence and conviction and remand for evidentiary hearing for dismissal of indictment which the ATF obtained against defendant Cristobal Cervantes through-

pg. (2)

outrageous government conduct. For the reasons discussed below, the court accordingly should grant Cervantes's motion to vacate sentence and conviction and should remand for evidencial hearing and eventually dismiss the indictment.

## II. Factual Background

To catch individuals suspected of engaging in stash house robberies, Bureau of Alcohol tobacco, firearms and explosives (ATF) special agent Michael (mike) widdell masquerades as a cocaine carrier who wishes to steal the cocaine he is expected to "deliver" from a location in the Laredo Area. Special agent widdell, consistent with Previous ATF reverse sting operations paints a picture of an all-too-easy stash house robbery. He tells unwitting individuals a tale of bountiful harvest of 20 to 25 kilograms of cocaine being guarded by just a few individuals. The only Problem: it's all a lie.

Special agent widdell's interaction with defendants began around January 2011 when an agent with Bureau of Alcohol tobacco, firearms and explosives (A.T.F.) received information that MARK Anthony milan (milan) was interested in Purchasing firearms. During recorded conversations, milan told the A.T.F. agent that he was interested in getting as many weapons as the agent could supply. The deal was eventually called off. Nevertheless the agents in their overzealousness in the war on crime created a second Reversed sting operation (witchhunt) fabricating the "story" that during the first Reverse sting operation a second A.T.F. agent saw a Picture of milan and immediately recognized him from a four years earlier (Dec.2007) attempt home invasion (in which "milan" was never convicted of) Based on the second agents identification of milan, taken together with other

information received from a confidential source, the A.T.F. elected to continue its investigation of milan in hopes of eventually ARRESTing him (R1, 303-438) Why call of the deal when milan was unable to procure the purchase money "quickly" enough if they hoped to Eventually ARREST him?) ARbitiary Reverse stigg operations. It still remains a mystery why from a fireARMs deal the agents decided to change it into a fake drug stash house robbery, since Neither defendants had prior drug stash house robbery arrests milan's Prior arrest wasn't even an attempt home invasion, milan was charged with Aggrevated assault because he nor the individuals in the video Never went inside the house they could of if they wanted as it is clearly seen in the video Evidence, but they didn't nor was it mentioned during trial that the house was a stash house. Futher Agent Weddell nor the Second Agent Rivas did not Provide any background regarding the Confidential Informants interaction with 'milan' since Agent Rivas testified that a C.I. informed him that "milan" was interested in Purchasing fireARMs. After the firearms sale fell through an undercover ATF Agent arranged a meeting with milan through a confidential informant (which never testified Nor any background of him was Provided.) to discuss the armed invasion of a non-existent stash house. Though a series of meetings-recordings of which were Presented at trial milan and Cervantes too were told about the drug stash house from which they could steal some twenty-five kilograms of cocaine. Specifically the undercover claimed to have been cheated by his cartel employer, and he wanted milan to steal cocaine from the cartelrs stash house to settle the score. According to the A.T.F.'s agent weddell the stash house would have at least twenty five kilograms, which the A.T.F. Agent weddell claimed he was owed $3,000 (R1; 406+ in 10-12) for his service transporting cocain

Pg 41

up north of the border (Laredo Texas) Agent weddell told milan that he and his team could keep all the cocaine recovered beyond the first five kilograms, which A.T.F Agent weddell would keep for himself and the CI (R1;499) Agent weddell also told milan that the house would be guarded by at least two People, one of whom would be a big, Armed and intimidating guy(R1;518) Milan and Cervantes aggreed to rob the stash house, because the agent was persuasive saying that it was a ones in a lifetime deal, Agent weddell said that if the cartel found out that he was the leader of the house stash Robbery they the cartel would kill him and his wife and he didn't want that (R1;514) Agent Weddell ask in several occasions to meet with Milan sand Cervanteses associates but they told him not to worry (R1;503) ; (R1;506-509) Cervantes told agent weddell that he personally didn't want the money, Agent weddell responded that he did need the money (R1;522) As Agent weddell planned on March 9, 2011 he called milan and Cervantes to inform them where they would meet (R1;530) Cervantes asked Agent weddel if there were going to be cops when they met agent weddel said No, Cervantes told Agent weddell he did not want to meet him that day But Agent weddell said "we got to go bro. We got to go" (R1;712) Agent Weddell set up a meeting at a local storage unit to pick up a Van the agent provided for the drug Robbery. During this conversation Cervantes said I want to act down meaning he wasn't trying to get arrested (R1;547) Agent weddell also provided a Black duffle bag (which he later testified during trial that he never gave Cervantes a black duffle Bag) perjury (R1;547-596) After 2½ minutes of couversation, multiple law enforcement arreste all participants. (R1 596 - R1;631) On june 7, 2011, a superseding indictment was Return charging Cervantes (1)conspiracy to posses with intent to distribute a controlled substance namely cocaine in excess of 5 kilogrames in violation Title 21 USC.; § 846, 841 (a)(1) and 841(b)(1)(a) and Possesion of a fire arm by convicted felo

in violation of title 18 USC § 922(g)(1) and 924(a)(2) and knowingly possessing firearms in futherance of the drug trafficking crime alleged in Count one of the indictment in violation of title 18 U.S.C § 924c(1)(A)(i) and one count of **aiding and abetting each other** to knowingly possess firearms in futherance of the drug trafficking crime alleged in count one of the indictment in violation of title 18 U.S.C 924c(1)(A)(i) and title 18 U.S.C § 2 (R) 116 - 120)(RE11)(TR11)

## III Legal Standard

The Fifth Amendment to the constitution commands that "no person shall be deprived of life, liberty, or property without due process of law" **U.S. Const. Amend. V.** The Due Process Clause stands as a bar to the Government invoking judicial process to obtain a conviction when its conduct is "outrageous" *United States v. Russell* 411 U.S. 423, 431-32 (1973)(Rehnquist J. The outrageous government-conduct doctrine permits a court to dismiss an indictment when the government engages in conduct "so grossly shocking and so outrageous as to violate the **universal sense of justice**" *United States v. Smith* 924 F.2d 889, 897 (9th Cir. 1991) Judicial scrutiny focuses solely on the governments actions — **not the alleged actions of the criminal defendant.** *United States v Restrepo,* 930 F.2d 705, 715 (9th Cir. 1991) The outrageous government conduct doctrine thus differs in that respect from an entrapment defense. Id. There is no **bright line test** for determining **wether to apply this doctrine** *United States v. Black* 733 F.3d 294, 302 (6th Cir. 2013) The 5th circuit also states "In fact the rule of this circuit instructs that even in the rarest of the most egregious prosecutorial misconduct the indictment may be dismissed upon showing of actual prejudice to the defendant accused" *United States v. McKenzie*

- 678 F.2d, 629, 631 (5th cir. 1982) (defendant must show prejudice before court will dismiss an indictment on either Constitutional or Supervisory grounds. These well settled Principles notwithstanding, the case literature indicates at least in loose dicta that "in the rarest of circumstances" government misconduct could be "so outrageous that it violates the principle of fundamental fairness under the Due Process Clause of the Fifth Amendment, and dismissal of an Indictment is warranted. see United States v. Asibor 109 F.3d 1223, 1230 (5th cir 1997)

Outrageous Government Conduct is typically asserted as a defense against an indictment or conviction. An indictment may be dismissed on the basis of outrageous Government Conduct when **governmental participation** is so outrageous or fundamentally Unfair (Perjudice) to "... move the courts ... to hold that the defendant was entrapped as a matter of Law" United States v. Graves 556 F.2d 1319 1322 (5th cir. 1977) Quoting United States v. Quinn 543 F.2d 640 (8th cir 1976) emphasis added. The Outrageous government defense originated in a Supreme Court case wherein the defendant asked the court to reconsider the Entrapment defense and adopt a rigid Constitutional rule that would preclude any prosecution when it is shown that the criminal conduct would not have been possible had not an undercover agent supplied an indespensable means to the commission of the crime "United States v. Russell, 411 U.S. 423, 431, 93 S. Ct. 1637, 36 L Ed.2d 366 (1973) Internal Quotations omitted. The court refused to adopt such Rule but allowed that "We may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that Due Process Principles —

would absolutely bar the Government from invoking judicial process to obtain a conviction" Id at 431-32. The burden at least in reverse sting cases like this one, is on the Government to establish that it's conduct does not surpass due process limitations U.S. V Black 733 F.3d. 300 (4th cir. 2013) Judicial Scrutiny focuses solely on the Government's actions- not the alleged actions of the Criminal defendants. United States V. Restrepo 930 F.2d 705, 712 (9th cir. 1991)

## IV. Discussion

Cervantes moves to vacate sentence and conviction and remand for evidentiary hearing for dismissal of indictment due to outrageous government Conduct, namely the ATFs entire fake stash-house scheme. In response the Government will contend that Cervantes role in the crime, and his co-defendants history instead of attempt home invasion which this charge was never brought against him and he was never prosecuted on, the charge was aggravated assault and still he was never prosecuted. But the Outrageous Government's conduct which comes with this stash House Robbery scheme and the Government Extensive involvement in dreaming up this fanciful scheme - including the arbitrary amount of drugs and illusory need for weapons and extra associates - transcends the bounds of Due Process So this Honorable court should render the Governments actions Outrageous

## A. Standing

The Government will contend that Cervantes lacks standing to challenge to vacate sentence and conviction and remand for Eventiary hearing for dismissal of indictment based on outrageous government conduct because Cervantes did not challenge the governments conduct before trial. But this error lies not on Cervantes but on his counsels innefective assistance since Cervantes during the coarse of the courts proceedings told his counsel Mr. Roberto Balli that this case was wrong all along since the A.T.F. agents Reverse sting like this one offend the constitution which charges with Law-Enforcement — not crime creation A reverse sting operation like this one trancends the bounds of due Process and makes the government "the oppressor of its people" U.s.v Black 733 F.3d at 318 (Noonan J.; dissenting.) In this case the constitution will not tolerate subjecting an individual to prosecution for an imaginary crime subject to a very real punishment which rests entirely on A.T.F. agents' whims (United States V. Antuan Duane Dunlap case No. 2:13-cr-00126-ODW-3) Judge Otis D. Wright II United States District Judge. In this collateral attack on ground of ineffective assistance of counsel, Cervantes has the burden of satisfying a two part test. First he will demonstrate that his counsels performance was deficient. Second, Cervantes will demonstrate that he was prejudiced by that deficient performance. Strickland v. Washington 466 U.S. 668, 104 S. ct. 2052 80 L. Ed. 2d 674 (1984) with respect to the first prong of the Strickland test the attorney's performance enjoys a presumption of adequacy which Cervantes has the burden to overcome; In Cervantes case paid attorney Roberto Balli's-

Pg. (8)

failure to challenge the outrageousness of Government conduct constitutes ineffective assistance. and the first prong of the strickland test has been satisfied. The issue, therefore revolves around the second prong i.e. whether there is a reasonable probability that for counsels error the outcome of the case would have been different. As it is clearly seen that for counsel failure to challenge the outrageous government conduct that comes with this Reverse sting operation like this one. since in assessing the propriety of the government's conduct, judicial scrutiny focuses solely on the government - not the alleged actions of the defendant. United States v. Restrepo, 930 F.2d 705, 712 (9th cir. 1991) So whether there were three defendants involved in the ATF's fanciful scheme or 3,000 the Government's conduct vis-vis this Indictment is still outrageous United States v. Joseph Cornell Whitfield Def: United States District Court for the Central District of California (2014) Case No. 2:13-cr-00126-ODW-02 June 18, 2014. With out this failure to challenge the outrageous Government conduct there is a reasonable probability that but for counsels error, the outcome of the case would have been different. For this reasons the court should find the motion to vacate sentence due to innefective assitance of counsel under 28 U.S.C § 2255 be and should be Granted an Remand for Eventiary hearing for a dismissal of indictment for the Outrageous government conduct.

## B. Outrageous Government Conduct.

The United States Supreme Court has drawn a line between infiltrating an ongoing criminal enterprise on one hand and manufacturing crime on the other. The court stated that "the function of Law enforcement is the prevention of crime and the apprehension of criminals. Manifestly, that function does not include the manufacturing of crime" Sherman v. United States 356 U.S. 369, 372 (1958). While the Government may not create crime, the Court has accepted that "infiltration is a recognized and permissible means of investigation" Russell, 411 U.S at 432; see also Black, 733 F.3d at 305 ("Also relevant is whether the government approached the defendant initially or the defendant approached government agents, and whether the Government proposed the "criminal enterprise or merely attached itself to one that was already and ongoing.") But for the undercover agent's imagination in this case there would be no crime. The undercover agent invented his drug-courier persona, the stash house, the 20 to 25 kilograms of cocaine supposedly inside the stash house, the two individuals supposedly guarding the stash, the need to use weapons and the idea of robbing the stash house. He even provided the puntative storage unit and get away van. Cervantes all he did was follow agents orders and went along with the agents plan. Despite the Supreme Courts admonition, the ATF manufactured this entire crime. It did not infiltrate an ongoing criminal enterprise, as there is no indication that Milan, Cervantes, Alvarez and Porras had any previous criminal affiliation between them. In fact Cervantes had just gotten out of TDCJ on felon in possesion fire arm conviction. "Although the defendant actions in participating in the plan clearly corroborate the defendants intent to carry out an armed robbery, defendants.

were responding to government's script." That fiction is likewise one of this court's misgivings and weighs in favor to vacate sentence and conviction and remand for evidentiary hearing for dismissal of indictment.

A court must consider the extent to which the government encouraged the defendant to commit the crime charged, "with mere encouragement being of lesser concern than pressure or coercion." Entrapment is a jury issue, where outrageous government conduct is an issue for the court. Compare Sorrells v. United States 287 U.S. 435,452 (1932) with United States v. Williams, 547 F.3d 1187,1199 9th cir. 2008). While there may be no indication that the undercover agent or the C.I. threatened or otherwise coerced Defendants to enter into conspiracy, one cannot turn a blind eye to the economic coercion inherent in a fake stash house case like this. The Government essentially targets People who are Poor and have distorted moral compasses. Cervantes 'willingness' to participate is just as consistent with Cervantes' being "broke" and in need of cash as it is with his Propensity to commit robberies, let alone his Propensity to commit home-invasion or stash house robberies. With the Government dangling over $600,000 in front of clearly impoverished individuals it is no surprise that they took the bait. In a recent scholarly article Professor Eda Katharine Tinto echoes the court's concerns. She writes, "The inducements used to Persuade suspects to commit or simply to agree to commit a serious and severely sentenced set crimes elicits significant questions regarding the extent of the defendants' blameworthiness and the possibility that the mandatory sentence will be disProPortional to any determination of culPability." Undercover Policing Overstated Culpability. 34 Cardozo L. Rev. 1401, 1451 (2013)

Professor Tinto's point is well taken. It is difficult to comprehend how a person like Cervantes deserves 20 plus years sentence for being part of a entirely fake robbery scheme for a mere 1 month. Especially when the extent of his involvement was merely to follow the agents orders and petition for help to collect a debt (R1:406, 1010-So while arm-twisting and extortionate threats would easily satisfy the Government coercion factor, so too should the Government hitting individuals like Cervantes where they are most vulnerable: their depressed economic circumstances. The court consequently should find that this factor weighs in favor of a outrageous government conduct determination. At the trial the Government repeatedly argued that it was defendants who dragged the plan out for one month through their continued excitement to participate and contact with agent weddell. But after the firearm sale fell through, an undercover ATF agent arranged a meeting with milan through a confidential Informant on February 10, 2011 (R1:389-491) On February 17, 2011 Agent set up a meeting for the second time with milan and Cervantes (R1:506-509) On february 24, 2011 Agent weddell set up a third meeting with milan and Cervantes (R1:522) On MARCH 8, 2011 Confidential informant called milan at night and informed that the cocaine load would be in Laredo on MARCH 9, 2011 (R1:537-538) These calls and meetings were set up by agent weddell or C.I. they demonstrate that Deffendants did not call the shots when it came to timing; instead they (the defendants) simply followed the under cover agent's lead and met him when he asked. The Government's drawn-out one month involvement in this fictitious stash house scheme thus only weighs in favoring to vacate sentence and conviction and remand

for evidentiary hearing for dismissal of indictment see Black 733 F.3d at 308 (observing that Government participation of longer duration is "of greater concern" than short-term involvement). The Government should n't misapprehends the law, in assessing whether the government has engaged in outrageous conduct, the focus is solely on the it's actions — not the defendants. Restrepo, 930 F.2d at 712. It is therefore erroneous to justify this fake stash house scheme based on what Defendants did or did not do. The nature of the ATF's conduct similarly tips the scales against the Government. In Black case the court noted that the undercover agent "provided no weapons, plans, manpower or direction about how to preform the robbery, even when the defendants sought his advice" Id 309. But here the undercover agent provided a get away van, puntative safe house, and most important of all — the entire scheme and its fictitious components. He also alleviated Defendants logistical and safety concerns when he "proposed that he would be inside the stash house at the time of the robbery... weddell also goaded Defendants to acquire weapons. He reapeated several times in the coarse of the month ruse that "at least one of the individuals guarding the nonexistant stash house always carried a firearm" Id. with Agent weddell continually sounding the war horn, it is not suprising that Defendants showed up to the final meeting with weapons. The Undercover agent's continued participation, assurances, and suggestions over the course of the month period made him "a partner in the criminal activity" rather than mere "observer" see Black, 733 F.3d at 308 His input was likewise "necessary" for

—Defendants to carry out their doomed plan, since but for Weddells imagination, there would have been no fictitious stash house robbery to begin with let alone the need for guns and extra associates. See Black, 733 F.3d at 309. In these stash house cases the Governments participation in the offense conduct is what makes them particularly repugnant to the Constitution. Everything about the scheme—and therefore almost everything bearing upon a defendant's ultimate sentence: hinges solely on the Government's whim. Why where there not 10 kilograms in the stash house? or 100? or 1,000? why were the guards allegedly armed—*necessitating* that defendants bring weapons along with them? All of these factors came down to the ATF and the undercover agent is one. That sort of arbitrariness offends the constitution's due process demands. see collins v. city of Harker Heights Tex, 503 U.S. 115, 127 n. 10 (1992)(The Due Process clause, like its **fore-bear** in the magna carta, was intended to secure the individual from the arbitrary exercise of the power of government ..." (citation omitted internal quotation marks omitted) Black, 733 F.3d at 317 (Noonan J. dissenting) (It is a violation of due process for sentences to be at the Arbitrary discretion of the A.T.F."). The ninth circuit has also remarked that these fake stash house cases draw dangerously close to another criminal justice issue: Sentencing Entrapment The court stated, "In fictional stash house operations like this one at issue here, the government has virtually unfettered ability to inflate the amount of drugs supposedly in the house and thereby obtain a greater sentence for the defendant. —

In fact, not only is the government free to set the amount of drugs in a fictional stash house at an arbitrarily high level, it can also minimize obstacles that a defendant must overcome to obtain the drugs. The **ease** with which the government can manipulate these factors makes us wary of such operations in general, and inclined to take a hard look to ensure that proposed stash house robbery was within the scope of the defendant's ambitions and **means**. United States v. Briggs, 623 F.3d 724, 729-30 (9th Cir. 2010) citation omitted. In fact the Ninth Circuit was so concerned with sentencing entrapment in stash house cases that the court formulated a specific test to apply in these cases: "in the case of fictitious stash house robberies, the **defendant need** only show a lack of intent or lack of capability to deal in the quantity of drugs charged" to establish sentencing entrapment. United States V. Yuman-Hernandez, 712 F.3d 471, 474-75 (9th Cir. 2013) cert. denied 134 S. Ct 261 (2013) With the capriciously selected amount of drugs, a defendant has the proverbial Sword of Damocles hanging over his head. He is not likely to let it fall and face the considerable prison time that surely awaits him if he loses at trial - especially when the Government has spent, like in this case, a month recording conversations inculpating him in the trumped-up conspiracy.

It is also no accident that the ATF selects the amount of drugs that it does. If a defendant is convicted of possessing five kilogram or more of cocaine with intent to distribute, (like in this case) he faces a 10 year mandatory-minimum sentence. 21 U.S.C. § 841(b)(1)(A). The defendant also faces another five years imprisonment for possessing a firearm in connection with a drug trafficking crime offense. 18 U.S.C § 924(c)(1)(A) Twenty to twenty five kilo-

grams in the fake stash house puts the defendant at a base offense level of 34, U.S.S.G § 2D1.1(5)(c). A fake stash-house defendant with a criminal-history category of one — a very unlikely scenario — therefore faces about 15 to 20 years imprisonment for a crime entirely dreamed up by the Government.

At trial, the Government proffered a rather curious justification for the arbitrary drug amount the undercover agent selected. The Government argued that based on special agents Weddell and Riva's training and experience, the 20 to 25 Kilograms at issue is commensurate with real stash house in Laredo area. Weddell had to select this amount in order to establish his credibility as a purported drug courier — the amount being within the realm of reality for people in the line of work per the Government. But the Government's rationalization is hopelessly circular. The Government prosecuted Cervantes for a fake crime it cut from whole cloth. To justify the serious sentence Cervantes is doing as the result of its imagination, the Government attempts to use it's creation of the crime, including the need to establish the undercover agent's credibility, as the validation for the amount of drugs. The amount of drugs then justifies the sentence. But since the Government created each necessity and justification the sentence, no longer bears a proportional relationship to the defendant's culpability — just the Government's imagination. Something more than mere bootstrapping is needed for the Government to justify taking 29 years away from Cervantes's life.

The Government's argument also proves the problem with this whole scheme. The Government asserts that it dreams up these stash-house robberies to catch people inclined to commit home invasions. But the Government must make the robbery scheme tempting enough to nab a potential criminal. The Government thus sets the drug amount at a level apparently it knows that no poverty-ridden individual could pass up. So the Government essentially admits that this ruse is not meant to simply skim off those individuals likely to commit similar crimes, rather it is designed to never fail. And the high number of fake stash-house convictions the Government has attained confirms this strategy. The court should find that the Government's extensive, essential participation in the offense conduct in this case tips the scales of justice in Cervantes's favor. Society does not win when the Government stoops to the same level as the defendants it seeks to prosecute - especially when the Government has acted solely to achieve a conviction for a made-up crime. Zero. That's the amount of drugs that the Government has taken off the streets as the result of this case and the hundreds of other fake stash house cases around the country That's the problem with creating crime: the Government is not making the country any safer or reducing the actual flow of drugs. But for the Government's action, the fake stash house would still be fake. The nonexistent drugs would still be nonexistent and the fictional armed Guards would still be fictional. See Black, 733 F. 3d at 302-03 (finding the Government's entire fiction to be troubling).

Instead the Government come close to imprisoning people solely because of **their thoughts and economic circumstances rather than their criminal actions.** Reverse stings actually serve to benefit real stash house operators. As the famed Law and Economics jurist Judge Richard Posner observed, The effect of a fictitious stash house sting, when the person stung is a real stash house robber, is therefore to make stash houses more secure by reducing the likelihood of their being robbed. A sting both eliminates one potential stash house robber (unless the defendant was entrapped) and **deters other criminals** from joining stash house robberies, since they may turn out to be stings. The greater security that fictitious stash house stings confer on real stash houses— **security obtained** at no cost to the operators of stash houses, reduces their cost of self-**protection,** which is a principal cost of the illegal-drug business. The lower a business's costs, the lower the prices charged consumers, and so the greater the demand for illegal drugs and the more sales and consumption of them. **The operators of stash houses would pay law enforcement to sting potential stash house robbers.** United States v. Kindle, 698 F.3d 401, 416 (9th cir. 2012)(Posner J, concurring and dissenting) reh'g en banc granted, opinion vacated (Jan. 16 2013) Cert. denied, 133 S.ct. 1743 (2013) But these stash house cases do cost money; federal taxpayers. As of this date there are 215,866 inmates in federal detention. Statistics Federal Bureau of prisons, http://www.bop.gov/about/statistics/population --Statistics.jsp (last visited MAR. 10 2014) According to the Bureau of Prisons, the average cost to incarcerate a federal inmate in 2011 was $28,893.40. Annual Determination of **Average-**

cost of Incarceration, 78 Fed. Reg. 16711, 16712 (MAR. 18, 2013). In fictitious stash house cases, the ATF usually seeks a 15 year sentence. Black, 733 F.3d at 317 (Noonan, J., dissenting). These fake robberies therefore cost taxpayers approximately $433,050 per defendant in incarceration cost alone— not to mention investigative, prosecutorial, defense, and judicial resources. That number only continues to skyrocket if a defendant is subject to a higher criminal-history category a aggravating factors. Society must question whether the astronomical cost associated with prosecuting fake crime is worth it. In a recent Wall Street Journal article, United States District Judge Michael A. Ponsor remark "Today, we imprison more of our people than any other country in the world.... Either our fellow Americans are far more dangerous than the citizens of any other country, or something is seriously out of whack in the criminal-justice system." Hon. Michael A. Posner, The Prisoner I Lose Sleep over, The Wall Street Journal Feb. 12, 2014. When the nation imprisons people solely because the Government dreams up a too good-to turn down robbery and then targets people it knows are eager to make an easy buck, Judge Ponsor's concerns are only further borne out. When the Government's goal of the reverse sting becomes landing convictions alone, the Government loses the justification for employing this crime-fighting tool. Wherever the line is drawn, this case falls on Cervantes side. Due process demands that much.

## C. Inherent Supervisory Power

The courts alternative basis for the court to vacate sentence and conviction and remand for evidentiary hearing for the dismissal of the indictment; The Court's inherent Power. The court may exercise this Power for three reasons: to remedy a constitutional or statutory violation; to protect judicial integrity by ensuring that a conviction rests on appropriate considerations "validly before a jury; or to deter future illegal conduct." United States v. Barrera-moreno, 951 F.2d 1089, 1091 (9th cir 1991); see also United States v. Hasting, 461 U.S. 499, 505 (1983)

## V. Conclusion

The court should be mindful of the supreme courts admonition in Russell: the federal judiciary does not have a "chancellor's foot" veto over law enforcement practices of which it did not approve. The execution of the federal law under our Constitution is confided primarily to the Executive Branch of the Government, subject to applicable constitutional and statutory limitations and to judicially fashioned rules to enforce those limitations." 411 U.S. at 435. The Executive Branch's enforcement obligation is certainly a difficult one, as people will always find new ways of evading law-enforcement detection and carry out their criminal Enterprises. This evershifting landscape demands that law enforcement agencies employ creative tactics to ferret out crime and keep society safe. But it is not the role of the Judicial Branch to merely rubberstamp whatever imaginative device the ATF and other agencies dream up. Rather, it is the duty of the courts "to declare

— all acts contrary to the manifest tenor of the Constitution void. Without this all the reservations of particular right or privileges would amount to nothing". The Federalist No. 78 (Alexander Hamilton). The time has come to remind the Executive Branch that the Constitution charges it with Law enforcement—not crime creation. A reverse-sting operation like this one transcends the bounds of due process and makes the Government "the oppressor of it's people" 733 F.3d at 318 (NOONAN J. dissenting). In this case, the Constitution does not tolerate subjecting an individual to prosecution for an imaginary crime subject to a very real punishment — a punishment which rests entirely on ATF agents' whims. Since it is the Court's sworn duty to uphold the Constitution, the Court should Grant Cervantes's motion to Vacate the sentence and Conviction and remand for evidentiary hearing for the dismissal of the indictment that A.T.F Agent's obtained through outrageous Government conduct.

| Cristobal Cervantes | Case No. 5:14-CV-00181 |
|---|---|
| v. | USM # 24443279 |
| United States of America | |

## Notice of Filing

Please take notice that on 2nd day and 3rd month 2015 I Cristobal Cervantes did file copies of the annexed document with the Clerk of District court

x_____

## Certificate of Service

I Cristobal Cervantes do solemly swear, under the penalty of perjury, that I serve copies of Annexed document on Honorable Judge Marina Garcia Marmolejo and Ass. US Attorney At 1100 matamoros st ste 200 Laredo TX. 78040.

x_____

Cristobal Cervantes # 24440-79
Federal Correction Complex-Allenwood USP
P.O. Box 3000
White deer PA. 17887

Legal
MAil

MAILED FROM
U.S. PENITENTIARY

MAR 03 2015

INSPECTED
U.S. MAIL

Honorable Judge. Marina GARCia
United States District Court
Southern District of Texas
1300 Victoria St. Ste. 1131
LAREDO TX. 78040.